## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MELISSA SUAREZ,

                    *Plaintiff,*

          v.

THE PENNSYLVANIA HOSPITAL OF
THE UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM,

                    *Defendant.*

CIVIL ACTION
NO. 18-1596

**PAPPERT, J.**                                    **November 29, 2018**

### MEMORANDUM

Melissa Suarez is a registered nurse who has long struggled with an opioid addiction. As a result, Suarez's nursing license has been suspended or restricted at various times in her career and she has been subject to monitoring by the Pennsylvania Board of Nursing. The Pennsylvania Hospital hired Suarez to work in its emergency department in 2013, knowing that at that time Suarez's license was in a probationary period and Suarez was being monitored. For a while Suarez did fine, and was even promoted after working in the emergency department for roughly two years. In 2016, notwithstanding her history of addiction, Suarez was prescribed oxycodone for chronic back pain. Her use of the medication unfortunately led Suarez to relapse.

Suarez confronted her recurring problem and successfully completed an intensive in-patient drug rehabilitation program. She subsequently returned to work, but under new licensing restrictions which, among other things, precluded her from working in any position involving the administration of controlled substances. This

meant, of course, she could no longer work in the emergency department. The Hospital allowed Suarez the opportunity to find another nursing position within the University of Pennsylvania Health System which she could perform consistent with the restrictions on her license. After more than six months, during which time Suarez declined at least one position because she did not want to work five days a week, the Hospital terminated her employment.

Suarez subsequently sued the Hospital, contending that depression and her status as a recovering drug addict caused the Hospital to fire her instead of placing her in another position. She asserts claims for discrimination, failure to accommodate and retaliation under the Americans with Disabilities Act and the Family and Medical Leave Act. The Hospital moved for summary judgment on all claims. After thoroughly reviewing the record, considering the parties' briefing and holding oral argument, the Court grants the Motion in its entirety and enters judgment for the Hospital.

I

Melissa Suarez began working for Pennsylvania Hospital on July 19, 2013 as a Clinical Nurse II in the emergency department. (Def.'s Mem. Supp. Summ. J. ("Def.'s Mem.") Ex. 8, ECF No. 19.) Lisa Triantos, the ED's Nurse Manager, hired Suarez. (Def.'s Mem. Ex. 4 ("Triantos Aff.") ¶ 4.) When Triantos made that decision, she knew Suarez's nursing license was, due to Suarez's past substance abuse, on a five-year period of probation and monitoring by the Professional Health Monitoring Program ("PHMP"). The license had been placed in that status by the Pennsylvania State Board

of Nursing on June 14, 2011.[1]  (Def.'s Mem. Ex. 3 ("Suarez Dep."), at 108:13–109:24;

Def.'s Mem. Ex. 5 at 146; Def.'s SMF ¶ 25.)  Triantos knew when she hired Suarez that

the probationary status of Suarez's license did not prevent her from performing the

responsibilities of a Clinical Nurse II in the ED.  (Triantos Aff. ¶ 4.)  After Suarez had

worked in the ED for two years, she received a promotion to Clinical Nurse III.  (Def.'s

Mem. Ex. 9.)

Beginning July 6, 2016, Suarez took twelve weeks of FMLA leave for the birth of

her son.  (Def.'s Mem. Ex. 11.)  On October 20, after she returned from her leave, her

primary care physician prescribed her oxycodone-acetaminophen for chronic back pain.

(Def.'s Mem. Ex. 13.)  She also began to see a pain management specialist who

prescribed her oxycodone and Lyrica on October 25.  (Def.'s Mem. Ex. 14.)  In November

of 2016, Suarez began taking oxycodone in excess of her prescriptions prior to going to

work.  (Def.'s SMF ¶ 45.)

When Suarez reported to work on November 11, 2016, her co-workers noticed

that she looked lethargic and was "not acting appropriately," and they were unable to

locate her several times during her shift.  (Def.'s Mem. Ex. 17.)  Three of the co-workers

told Triantos about Suarez's behavior; Triantos met with Suarez and noticed that she

seemed tired and was slurring her speech.  (Def.'s Mem. Ex. 18 ("Triantos Dep."), at

[1] Professional licensing in Pennsylvania is administered by the Pennsylvania Department of State,
which consists of a number of agencies including the Pennsylvania Board of Nursing.  *State Board of
Nursing*, Pennsylvania Department of State, https://www.dos.pa.gov/Professional Licensing/Boards
Commissions/Nursing/Pages/default.aspx (last visited Nov. 27, 2018).  In 2009, Suarez voluntarily
reported to the Nursing Board that she had abused narcotics.  (Def.'s Stmt. of Facts ("Def.'s SMF")
¶ 19.)  After making this report, she entered a contract with the Pennsylvania Nurse Peer Assistance
Program ("PNAP"), a monitoring and advocacy program provided by the Nursing Board.  (*Id.* at
¶ 21.)  The Nursing Board suspended Suarez's nursing license in May of 2010.  (*Id.* at ¶ 22.)  The
Nursing Board's June 14, 2011 order reinstated Suarez's nursing license subject to probation and
monitoring by the PHMP.  (Def.'s Mem. Ex. 5.)  The PHMP monitors licensed professionals who
suffer from mental and physical disorders.  (Def.'s SMF ¶ 10.)

46:7–9, 47:18–21, 48:9–17.) Suarez testified that she was not feeling well that day, but she did not think she could leave work because she had exhausted her FMLA leave and vacation and sick time. (Def.'s SMF ¶ 50.) Triantos asked Suarez to take a drug test, and Suarez tested positive for oxycodone and oxymorphone. (Suarez Dep. 145:15–16; Triantos Dep. 77:3–12; Def.'s Mem. Ex. 20.) Suarez was permitted to return to work when she provided prescriptions for the opioids to the Hospital's Employee Health Nurse. (Pl.'s Mem. Opp'n Summ. J. ("Pl.'s Mem.") Ex. B ("Umile Dep."), ECF No. 23, at 27:17–28:11.) Suarez received back pay for her time off while the drug test was pending. (Oral Arg. Tr. 24:24–25, 25:1–3.)

Shortly after the drug test, Suarez spoke on the telephone and in person with Triantos and Human Resources Manager Len Umile. (Suarez Dep. 154:21–24.) During the phone conversation, she told Triantos and Umile that she was taking antidepressants, and they asked what they could do to help her. (*Id.* at 153:21–22, 156:2–3; Umile Dep. 30:14–31:1.) Suarez told them she "felt [she] needed a lot of counseling and that [she] needed a lot of help, that [she] needed some time off to address those issues." (Suarez Dep. 159:16–19.) According to Suarez, Triantos and Umile told her she could work part-time or *per diem*, but she "couldn't take time off . . . because [she] had exhausted all of her time that [she] could take off." (*Id.* at 155:6–11, 159:21–23.) Suarez told them she could not afford to work part-time or *per diem* and that she had tried, unsuccessfully, to enroll in the Hospital's Employee Assistance Program. (*Id.* at 155:10–18.) They said they would "look into" her attempt to enroll. (*Id.*) During Suarez's in-person meeting with Triantos and Umile, they again offered her the option of working fewer hours and suggested that she reduce her involvement

in "the different initiatives [she] was involved in, like the shared governance, [and] professional excellence" groups. (*Id.* at 156:19–157:9.)

In December of 2016, Suarez's son was diagnosed with asthma and she requested intermittent FMLA leave to care for him. (*Id.* at 167:4–22; Def.'s Mem. Ex. 22.) The Hospital denied her request because she had exhausted her FMLA leave earlier that year for her son's birth. (Def.'s Mem. Ex. 23.) Suarez nonetheless missed several days of work to care for her son, and the Hospital did not discipline her. (Def.'s Mem. Ex. 22; Suarez Dep. 177:20–24.) When Suarez's grandmother passed away around the same time, Triantos allowed her to take thirty-six hours of bereavement leave, roughly five times more than she was entitled to, due to the closeness of the relationship between Suarez and her grandmother. (Def.'s Mem. Ex. 22.)

In early 2017, an assistant nurse manager at the Hospital told Triantos about several incidents in which Suarez had disappeared from work, failed to appropriately monitor patients and composed incomplete or inaccurate patient reports. (Def.'s Mem. Exs. 26–29.) On February 8, 2017, Suarez received a written warning about her performance and attendance infractions. (Def.'s Mem. Ex. 30.) Around that time, unbeknownst to the Hospital, Suarez was taking "upwards of 900mgs" of oxycodone per day, roughly ten times her prescribed dosage. (Def.'s Mem. Exs. 15, 24–25, 31.)

Suarez entered Caron Treatment Center, a drug rehabilitation facility, on February 12, 2017. (Def.'s Mem. Ex. 31.) Doctors at Caron diagnosed her with Opioid Use Disorder and Major Depressive Disorder. (Def.'s Mem. Ex. 36.) On February 16, 2017, she applied for FMLA leave for the treatment but was denied, again because she exhausted her FMLA leave for the birth of her son. (Def.'s Mem. Ex. 34.) She then

submitted a request to the Hospital for leave as an accommodation under the ADA, listing "postpartum depression" and "addiction" as her disabilities. (Def.'s Mem. Ex. 35.) The Hospital approved the request and later approved a two-week extension of the leave time for outpatient treatment. (Def.'s Mem. Ex. 37.) Suarez was released from Caron on March 13, 2017 with a recommendation to return to nursing after a two-week transition period. (Def.'s Mem. Ex. 41.) Doctors at Caron encouraged her to enroll in PNAP again, but Suarez did not think it was necessary to do so. (*Id.*; Suarez Dep. 210:20–211:23.)

Sometime in March of 2017, Umile received a notice from Caron that Suarez would be ready to return to work at the end of the month. (Def.'s Mem. Ex. 43 ("Umile Aff.") ¶ 2.) Umile contacted Christine Tierney, the Hospital's Chief Human Resources Officer, to discuss whether the Hospital or Suarez should report Suarez's recent drug use and treatment to the Nursing Board. (*Id.* at ¶¶ 3–4.) On March 24, Tierney spoke with a PHMP case manager who told Tierney that Suarez should report her recent drug use to the Board and disclose it on her nursing license renewal form. (*Id.* at ¶ 9; Def.'s Mem. Ex. 46.) The case manager also told Tierney it would be beneficial to Suarez if she self-reported to the Board before the Hospital reported to the Board on her behalf. (Umile Aff. ¶ 10; Def.'s Mem. Ex. 46; Def.'s Mem. Ex. 44, ("Tierney Aff.") ¶ 7.)

According to Suarez, Umile called her the day before she was to return to work and "told [her] that she would not be coming back to work and that [she] had to report [her]self to the state board." (Suarez Dep. 198:18–23.) Suarez accordingly self-reported on March 29, 2017 and entered into a contract with PNAP which restricted her from practicing nursing "in any capacity that involves the administration of controlled

substances for a period of at least six months following return to work as a nurse" and also prevented her from returning to practice without written permission from a PHMP case manager. (*Id.* at 203:24–204:5; Def.'s Mem. Ex. 48.) The Hospital independently reported Suarez to the Nursing Board on April 6, 2017. (Umile Aff. ¶¶ 15–16; Def.'s Mem. Ex. 50.) On May 12, while Suarez was waiting for permission from a PHMP case manager to return to work, Umile sent Suarez a letter stating that the Hospital planned to post her ED position but would keep Suarez listed as an active employee until she could return. (Def.'s Mem. Ex. 54.) On June 16, the PHMP notified Suarez that she could return to work as long as she complied with certain license restrictions, including not practicing in any capacity that involves the administration of controlled substances and not working in the ED. (Def.'s Mem. Ex. 52.)

In early July of 2017, Suarez emailed Umile to ask whether she should apply for positions, sit for interviews or attend orientations because she was "not sure how things go from here regarding placement." (Pl.'s Mem. Ex. CC at 105.) Umile responded that she should review open positions on the Penn Medicine career website "to see what looks like what [sic] may be a good fit" and tell him when she applied for positions within her restrictions. (*Id.* at 104; Suarez Dep. 223:8–9.) Umile testified that there were positions a nurse could perform even with restrictions such as those placed on

Suarez's license. (Umile Dep. 73:10–20.) He characterized them as "non-bedside" nursing positions.[2] (*Id.*)

On July 17, Suarez emailed Umile with a list of positions for which she had applied. (Pl.'s Ex. BB.) In the email, she stated that she needed "to continue on [her] current shift (days) because of childcare," and later told Umile she could not work five days per week. (Pl.'s Mem. Exs. BB–CC.) Umile emailed Jamal Robinson, a University of Pennsylvania Health System recruiting specialist, asking if "there might be interest" in Suarez's applications. (Def.'s Mem. Ex. 55.) Robinson responded that the positions for which Suarez applied would require her to work during the business week, but Suarez said she was "unable to work [a] Monday–Friday business work week." (*Id.*; Def.'s Mem. Ex. 57.) Suarez had one interview for a position, "case management at HUP," but she was "unable to commit" to that position because it would have required her to work five days per week. (Def.'s Mem. Ex. 57.)

On August 29, 2017, Umile wrote to Suarez stating "I believe that it is approaching six months for you being out of work and as such we cannot continue to keep you active, so September 30, 3017 [sic] will be your deadline to procure a position" and that she would be fired if she did not find a position by October 1, 2017. (Def.'s Mem. Ex. 59.) Umile again asked Suarez to send him a list of positions to which she planned to apply so he could continue to speak with recruiters on her behalf. (*Id.*)

---

[2] Umile testified that at least ten of the positions to which Suarez applied were non-bedside positions, including (1) Clin. Resource Coord. ED (Umile Dep. 79:14–20), (2) Nursing Prof. Dev. Spec. (*Id.* at 81:11–14), (3) Nursing Prof. Dev. Spec. A (*Id.* at 87:1–2), (4) Home Care Coordinat. HUP (*Id.* at 87:20–21), (5) Manager Care Unit (*Id.* at 88:10–11), (6) Clin. Documentation Spec. (*Id.* at 88:15–16), (7) Nursing Clinical Coord. (*Id.* at 88:17–18), (8) another Nursing Prof. Dev. Spec. position (*Id.* at 19–20), (9) EPS RN (*Id.* at 89:10–12) and (10) Clinical Education Coordinator (*Id.* at 89:15–17). *See also* (Pl.'s Mem. Ex. BB). Umile testified that one other position to which Suarez applied, Intervention Nurse, "could be" a non-bedside position. (Umile Dep. 82:16–83:10.)

Umile testified that he had no decision-making authority with respect to her applications and that only the hiring managers for each position could hire Suarez for a new job. (Umile Dep. 75:13–76:7.)

On September 25, 2017, Suarez told Matt Cohen, another human resources representative, that "email follow-ups from potential positions" had been sent to the work email address listed on her resume. (Def.'s Mem. Ex. 60.) She told Cohen she did not see the emails previously because she thought her home email address had been listed on her resume. (*Id.*) She also said that her work email account was "poorly accessible" to her because she must "continue to log-in each time [she] want[s] to review any new emails" and her inbox was "bombarded with several newsletters from the health system . . . making filtering through very difficult." (*Id.*)

Suarez did not obtain before September 30 a new position for which she was eligible given the Nursing Board's restrictions and the Hospital fired her on October 1. (Umile Aff. ¶ 19.)

## II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice.

*Id.* at 252.  There must be evidence by which a jury could reasonably find for the non-moving party.  *Id.*

Reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  A court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III

During oral argument on the Hospital's Motion, Suarez's counsel clarified her four specific claims, some of which have multiple parts.  Suarez first contends that the Hospital discriminated against her in violation of the ADA when it failed to reinstate her to a non-bedside nursing position and ultimately fired her because of her depression and her status as a recovering drug addict.  She next alleges that the Hospital failed to accommodate her depression in November of 2016 through January of 2017 and failed to accommodate her as a recovering drug addict after her release from Caron.  Suarez also contends that the Hospital retaliated against her for seeking accommodations for depression, for entering Caron and for requesting reinstatement as an accommodation for her disability as a recovering drug addict.  Finally, Suarez claims the Hospital retaliated against her for requesting FMLA leave for treatment at Caron in February of 2017.[3]

---

[3] The Complaint also alleged FMLA interference, but Suarez's counsel withdrew that claim in an October 1, 2018 email to defense counsel.  *See* (Def.'s Mem. Ex. 2).

Suarez's discrimination and retaliation claims under the ADA and FMLA are evaluated under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Suarez must first establish a *prima facie* case for each claim. This burden is not intended to be onerous. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If she can do so, the burden shifts to the Hospital to articulate a legitimate nondiscriminatory reason for its actions. "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)). If the employer succeeds, the burden shifts back to Suarez to prove by a preponderance of the evidence that the Hospital's legitimate, nondiscriminatory reasons are pretext for discrimination. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

As more fully explained below, Suarez cannot on this record establish a *prima facie* case for any of her claims. Even if she could, the Hospital had legitimate, non-discriminatory reasons for its actions and Suarez cannot show that these reasons were pretext for discrimination.

## A

To establish a prima facie case of discrimination under the ADA, Suarez must show that she (1) has a disability within the meaning of the ADA, (2) is a "qualified individual" and (3) suffered an adverse employment action because of her disability. *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).

A plaintiff is disabled under the ADA if she has a physical or mental impairment that substantially limits one or more of her major life activities, a record of such an impairment or is regarded by her employer as having such an impairment. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 762 (3d Cir. 2004).

Suarez alleges two disabilities for purposes of this claim: depression and that she was as a recovering drug addict. The Hospital does not dispute that Suarez was disabled by depression after she completed rehabilitation at Caron; doctors there diagnosed her with Major Depressive Disorder. *See* (Def.'s Mem. Ex. 36). With respect to her status as a recovering drug addict, the Hospital argues that Suarez was not a recovering drug addict within the meaning of the ADA any time before her termination because the ADA does not protect active illegal drug users and after Suarez left Caron her drug use was recent enough to justify the Hospital's reasonable belief that her usage was an ongoing problem.

While the ADA does not protect an employee who is "currently engaging in the illegal use of drugs" when the employer acts on the basis of such use, 42 U.S.C. § 12114(a), the law does protect an employee who "has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs" or "is participating in a supervised rehabilitation program and is no longer engaging in such use." *Id.* at § 12114(b). An employee's drug use is "current" if it occurred recently enough to justify the employer's reasonable belief that the employee's involvement with drugs is an ongoing problem. EEOC Technical Assistance Manual on the Employment Provisions (Title I) of the ADA § 8.3 (1992); *see also Salley v. Circuit*

*City Stores*, 160 F.3d 977, 980 n.2 (3d Cir. 1998). In order for an employee to be "substantially limited" by her status as a recovering drug addict, she must be addicted to drugs but no longer "currently engaging" in illegal use. EEOC Technical Assistance Manual § 8.5. Whether an employee is "recovering" or "currently engaging" in illegal drug use is determined on a case-by-case basis. *Salley*, 160 F.3d 977, 980 n.2 (quoting EEOC Technical Assistance Manual § 8.3).

Here, there is a question of fact for a jury as to whether Suarez was a recovering drug addict within the meaning of the ADA during the period of time between her release from Caron and her termination. Specifically, jurors could find that the Hospital could not have reasonably believed that Suarez's illegal use of drugs was an ongoing problem by September 30, the last date the Hospital permitted her to apply for new positions, or October 1, the date of her termination. The record demonstrates that Suarez completed twenty-nine days of intensive inpatient treatment for substance abuse disorder at Caron. (Def.'s Mem. Supp. Ex. 41.) She left Caron with a recommendation to return to the practice of nursing two weeks after the date of her release "to transition her recovery." (*Id.*) After her release from Caron, Suarez entered a monitoring contract with PNAP which required her to continue attending group or individual therapy sessions. (Def.'s Mem. Ex. 48.) Suarez testified, and the Hospital does not dispute, that she did not use illegal drugs at any time during the five and a half months between her treatment at Caron and her termination. (Suarez Dep. 128:12–19.) There is no record evidence that Suarez's illegal drug use was an ongoing problem between leaving Caron and October 1, leaving for jurors the determination as

to whether or not the Hospital could have had a reasonable belief to the contrary at any point during that timeframe.

ii

An employee is a "qualified individual with a disability" under the ADA if she (1) satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills and licenses and (2) is able to perform the essential functions of the position held or desired, with or without reasonable accommodation. *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017).

The Hospital claims that Suarez cannot show on this record that she was qualified for any position after the Nursing Board placed restrictions on her license. The Hospital argues that there is no evidence that Suarez satisfied the prerequisites for any of the positions to which she applied when she sought reinstatement. The record does indicate, however, that Suarez was qualified for at least some of the non-bedside positions for which she applied. Specifically, Umile acknowledged that Suarez could perform the functions of those positions despite her licensing restrictions. (Umile Dep. 79:14–89:17.) Suarez had an interview for one such position, "case management at HUP," and she received other "email follow-ups from potential positions." (Def.'s Mem. Exs. 57, 60.) Additionally, Umile contacted at least one Hospital recruiting specialist on Suarez's behalf and offered to continue communicating with recruiters at the Hospital "to put in a good word for her" as she submitted her applications. (Def.'s Mem. Exs. 55, 59; Umile Dep. 91:7.) Jurors could easily conclude that none of this would have

happened if Suarez was not, at minimum, a feasible candidate for at least some of those positions.

iii

To satisfy the third element of her *prima facie* case, that she suffered an adverse employment action as a result of discrimination, Suarez must present evidence sufficient to establish that one or both of her disabilities were a "determinative factor" in the Hospital's adverse employment decisions. *Decker v. Alliant Techs.*, LLC, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 579–80 (3d Cir.1998); *Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 214–15 (3d Cir. 2000).

Suarez claims that her depression and status as a recovering drug addict were determinative factors in the Hospital's failure to reinstate her and decision to terminate her.[4] The Hospital does not dispute that Suarez suffered adverse employment actions, but believes the record does not support a finding that her disabilities were a determinative factor in the Hospital's decisions. Somewhat confusingly, Suarez attempts to satisfy this element of her *prima facie* case with purported evidence showing that the Hospital's reasons for its actions were pretextual. As explained in Section IV, *infra*, she cannot do so.

---

[4] Suarez initially claimed that the Hospital's attempt to force her to self-report her substance abuse to the Nursing Board after her release from Caron, and its decision to independently report her to the Board, were also adverse employment actions. At oral argument, Suarez's counsel clarified that the only adverse employment actions she alleges for the purposes of this claim are the Hospital's failure to reinstate and then fire her. (Oral Arg. Tr. 63:20–24, 65:4–13.)

B

An employee bringing an ADA failure-to-accommodate claim must establish: (1) she was disabled and her employer knew it, (2) she requested an accommodation or assistance, (3) her employer did not make a good faith effort to assist and (4) she could have been reasonably accommodated. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). Suarez claims that the Hospital failed to accommodate her depression in November of 2016 through January of 2017 because Umile and Triantos did not tell her she could take unpaid leave. She also claims that the Hospital failed to accommodate her as a recovering drug addict when it failed to reinstate her to a position at the Hospital after her release from Caron.

i

With respect to the depression-related aspect of her claim, the record indicates that the Hospital knew Suarez suffered from depression during the time period in question. Suarez testified that on November 11, at least one of her co-workers "thought [Suarez] was depressed" at work and reported Suarez's unusual behavior to Triantos. (Suarez Dep. 145:9–16; Triantos Dep. 46:5–9.) Suarez also testified that when she spoke with Triantos and Umile on the telephone after her drug test in November of 2016, she believes she told them she was taking antidepressants. (Suarez Dep. 156:2–3.) Umile himself testified that he thought Suarez told him she was "dealing with some depression" at the time of the drug test and that is why she was taking the medications for which she tested positive. (Umile Dep. 30:10–31:1.)

The record also allows a reasonable juror to find that Suarez asked Triantos and Umile for time off from work to accommodate her depression. Suarez testified that when she met with Triantos and Umile in November of 2016 after her drug test, she told them she was taking antidepressants and needed counseling and time off to "address those issues." (Suarez Dep. 153:21–157:18). She also testified that in December of 2016, she "was trying to find any way to get time off to get help," (*Id.* at 168:6–7), and in January she met with Triantos and told Triantos she needed time off because "she didn't think that there was anything that being at work was going to help [her] with [her] personal problems." (*Id.* at 169:24–170:4.)

The record also shows, however, that the Hospital made a good faith effort to assist Suarez in seeking an accommodation for her depression. Suarez testified that when she spoke with Triantos and Umile over the telephone after her drug test, they offered her the options of working part-time or *per diem*. When Triantos and Umile told her those options "would involve a pay cut," (Suarez Dep. 155:6–8, 155:10–11), Suarez responded that she "couldn't afford to do that." (*Id.* at 11–13.) Suarez's position would preclude reasonable jurors from concluding she would have accepted an offer of an unpaid leave of absence.

When Suarez met with Triantos and Umile in person, they "again talked about whether or not [she] thought again about trying to cut down on [her] hours" and "discussed pulling [her] out of all of the different initiatives [she] was involved in" at the Hospital. (*Id.* at 156:19–24.) In early January of 2017, after Suarez was told she was ineligible for FMLA leave to care for her son, Triantos told Suarez in a text message that she could apply for "other medical" leave for herself, but not for a family

member's medical needs.  (Def.'s Mem. Supp. Summ. J. Ex. 22, ECF No. 19-5.)  Triantos also encouraged Suarez to contact the Hospital's Disability Management Department.  (*Id.*)  In February of 2017, when Suarez entered Caron, she submitted an "Employee Reasonable Request for Accommodation" form to the Hospital requesting unpaid leave to accommodate both her depression and her drug addiction.  (Def.'s SMF ¶ 95.)  The Hospital approved Suarez's request and later extended her leave to allow her to participate in outpatient treatment.  (*Id.* at ¶ 97.)

ii

With respect to Suarez's claim that the Hospital failed to accommodate her as a recovering drug addict by not reinstating her to one of the non-bedside positions after her release from Caron, there is an issue of fact as to whether or not Suarez was a recovering drug addict at some point between her release and September 30, the last date the Hospital permitted her to apply to new positions.  *See supra* Section III.A.i.

Fatal to Suarez's claim, however, is that she never requested reinstatement to a non-bedside position as an accommodation for her disability as a recovering drug addict.  She requested reinstatement to a non-bedside nursing job because the Nursing Board restricted her license, precluding her from working in the emergency department.  The restrictions were imposed on Suarez's license specifically because of her use of illegal drugs, something the Hospital was not obligated to accommodate.

C

To establish a *prima facie* case of retaliation under the ADA, Suarez must show (1) protected employee activity, (2) an adverse action by the Hospital either after or contemporaneous with the protected activity and (3) a causal connection between the

protected activity and the Hospital's adverse action. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003).

Suarez claims that the Hospital retaliated against her by failing to reinstate her and then firing her because she asked for accommodations for depression in November of 2016 through January of 2017 and in February of 2017 and also because she requested an accommodation as a recovering drug addict in February of 2017 and after leaving Caron. The Hospital does not dispute that Suarez can establish the first and second prongs of her *prima facie* case; the only issue is whether the record evidence suggests a causal connection between Suarez's protected activity and the Hospital's actions.

An employee may establish a causal connection between protected activity and an adverse employment action by showing (1) temporal proximity between the protected activity and adverse action, (2) a pattern of antagonism after the protected act or (3) that the record taken as a whole supports an inference of retaliation. *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 530 (E.D. Pa. 2014) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). This inquiry is "highly fact-based" and turns on "the particular context in which the events occurred." *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 447 (E.D. Pa. 2014), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015) (citing (*Farrell*, 206 F.3d at 280)). A causal connection between protected activity and the adverse action may be established by "temporal proximity" alone, but the proximity must be "unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams*, 380 F.3d at 760 (quoting *Shellenberger*, 318 F.3d at 183, 189 n.9) (finding that an employee could not

establish his ADA retaliation claim where two months elapsed between protected activity and the adverse action and the employee "put forth no other evidence" of retaliatory motive). While the "mere passage of time is not legally conclusive proof against retaliation," *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (citing *Robinson v. S.E. Pa. Transp. Authority*, 982 F.2d 892, 894–95 (3d Cir.1993)), "the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997)).

Again, Suarez requested accommodation for her depression between November of 2016 and February of 2017. The Hospital kept Suarez on as an active employee and allowed her to seek other positions which accommodated the restrictions on her nursing license until September 30 before firing her on October 1, almost eight months later. Such a lengthy period of time is certainly not "unusually suggestive" of retaliatory motive and Suarez points to no record evidence of a pattern of antagonism or that the record as a whole supports an inference of retaliation.

With respect to her requests for leave in February of 2017 and for reinstatement to a non-bedside nursing position because she was a recovering drug addict, Suarez argues that the temporal proximity between these requests and the Hospital's failure to reinstate her demonstrates a causal connection. There is nothing in the record to indicate that her request for reinstatement under the ADA was unreasonable or in bad faith, so the request could be construed as a protected activity even though she was not

entitled to that accommodation.  *See supra* Section III.B; *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) (citing *Williams*, 380 F.3d at 759 n.2) ("[A]n ADA retaliation claim . . . only [requires] that the plaintiff has a 'reasonable, good faith belief that [she] was entitled to request the reasonable accommodation [she] requested.'").  Suarez's request for reinstatement occurred, at the latest, on June 16, 2017, when the PHMP sent Suarez a letter stating that she could return to nursing with restrictions.  (Def.'s Mem. Ex. 52.)  Without other evidence of retaliatory motive, no reasonable juror could find that the two-and-a-half-month gap between Suarez's request and the last date the Hospital permitted her to apply for new positions, September 30, establishes a causal link.  *See Williams*, 380 F.3d at 760.

D

"The [FMLA's] prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220(c).  To establish a *prima facie* case of retaliation under the FMLA, Suarez must show (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision and (3) the adverse decision was causally related to her leave.  *Lichtenstein v. Univ. Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012).  Suarez claims that by failing to reinstate and then firing her, the Hospital retaliated against her for applying for FMLA leave in February of 2017.

There is no dispute that by February of 2017, Suarez knew she had used all the FMLA leave to which she was entitled.  *See* (Def.'s SMF ¶ 50; Def.'s Mem. Exs. 22–23.)  Suarez thus arguably had no right to FMLA-qualifying leave.  Even if it is an "open

question of law" as to whether or not the employee's entitlement to FMLA leave is an element of a retaliation claim, *Isley v. Aker Phila. Shipyard, Inc.*, 275 F. Supp. 3d 620, 634 (E.D. Pa. 2017), there is no evidence in the record that the Hospital's failure to reinstate Suarez to a non-bedside position before firing her was related to her February 2017 request for FMLA leave.

When the "temporal proximity" between activity protected by the FMLA and the employer's adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment." *Lichtenstein*, 691 F.3d at 307 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.2007)). "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Id.* (quoting *Farrell*, 206 F.3d at 280)). Suarez requested FMLA leave on February 16, 2017 to enter Caron. (Def.'s Mem. Ex. 34.) The Hospital permitted her to continue applying for new positions until September 30, 2017, more than six months later. Without other evidence to raise an inference of a causal connection, no reasonable juror could find that the Hospital's failure to reinstate her or then fire her were causally related to her request for FMLA leave. *See Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 417 (E.D. Pa. 2014), *aff'd*, 587 F. App'x 731 (3d Cir. 2014) (noting that a five-month gap between protected activity and the employer's adverse action "is a far cry from the time frames the Third Circuit has considered to be particularly suggestive of a causal connection").

IV

Even if Suarez could establish *prima facie* claims of discrimination or retaliation under the ADA or FMLA, the Hospital can show that it had legitimate, non-discriminatory reasons for its actions and Suarez cannot show that these reasons were a pretext for unlawful discrimination.

Suarez does not even contend that the Hospital lacked legitimate, non-discriminatory reasons for its decisions. The restrictions placed on her nursing license by the Nursing Board prevented her from returning to her position in the ED. (Def.'s Mem. Ex. 52.) Umile nevertheless kept Suarez listed as an active employee and invited her to apply for open positions that she could perform despite her license restrictions. (Def.'s Mem. Ex. 54; Pl.'s Mem. Ex. CC at 104; Suarez Dep. 223:8–9.) Although Umile had no decision-making authority with respect to her applications, (Umile Dep. 75:13–76:7), he contacted at least one University of Pennsylvania Health System recruiting specialist on Suarez's behalf and offered to continue communicating with recruiters "to put in a good word for her" as she submitted her applications. (Def.'s Mem. Exs. 55, 59; Umile Dep. 91:7.) Suarez, however, was unwilling to work five days per week until her time to find a position had almost expired; she was offered an interview for a job but turned it down because she wanted days off during the week. (Def.'s Mem. Exs. 55, 57–58.) She also did not check her email when recruiters were attempting to contact her. (Def.'s Mem. 60.) Ultimately, Umile warned her that the Hospital could not continue to keep her listed as an active employee and gave her until September 30, 2017 to find a new position. (Def.'s Mem. Ex. 59.)

To survive summary judgment, Suarez must provide direct or circumstantial evidence of pretext with sufficient probative force from which a fact finder could reasonably disbelieve the Hospital's articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the Hospital's actions. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998). Suarez "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.1992)).

In support of her pretext argument, Suarez points specifically to: the temporal proximity between her depression diagnosis at Caron, her release from Caron and the Hospital's failure to reinstate her; the fact that she was a "quality performer" capable of filling non-bedside nursing positions and purported inconsistencies in Umile and Triantos's deposition testimony. At oral argument, counsel also claimed that the mere fact that Suarez wasn't hired for a non-bedside position given the Hospital's size and purported short-staffing raises an inference of discrimination. (Oral Arg. Tr. 56:25–57:5.)

No reasonable juror could find from the temporal proximity between Suarez's depression diagnosis at Caron, her release from Caron and the Hospital's failure to reinstate her that the Hospital's stated reasons for failing to reinstate her are pretextual. Doctors at Caron first diagnosed Suarez with depression on February 13, 2017. (Def.'s Mem. Ex. 31.) She was released from Caron on March 13. (Def.'s Mem.

Ex. 41.)  These events occurred long before September 30, the last date the Hospital

permitted Suarez to apply for new positions.  Nothing about the proximity between

these events suggests that Suarez's depression or status as a recovering drug addict,

which she could not claim until sometime after her release from Caron, were more

likely than not motivating or determinative causes of the Hospital's actions.

The fact that Suarez was a "quality performer" capable of filling non-bedside

nursing positions is not evidence of pretext either.  Suarez cites *Ross v. Campbell Soup*

*Co.*, 237 F.3d 701 (6th Cir. 2001), for the proposition that evidence of an employee's

qualifications can be sufficient to establish pretext.  In *Ross*, the Sixth Circuit Court of

Appeals reversed the lower court's decision to grant summary judgment for an

employer in part because the record evidence demonstrated that the employer's

proffered reason for terminating him, poor job performance, was pretextual.  *Ross* is

inapplicable to this case; the Hospital does not argue that it did not fail to reinstate or

terminate Suarez due to her poor job performance.

Finally, any purported inconsistencies in Umile and Triantos's testimony are

immaterial and could not lead a reasonable juror to find unworthy of credence the

Hospital's reasons for eventually terminating Suarez after she could not obtain a job

outside of the emergency department.  Suarez cites Umile's testimony that "the first

time [he] had become aware of any substance abuse issues with Ms. Suarez" was in

March of 2017.  (Umile Dep. 53:11–16.)  She argues that this is inconsistent with an

email Umile sent Triantos on December 19, 2016 in which he asked, "Do you think

[Suarez] is having a relapse"?  (Pl.'s Mem. Ex. L.)  Next, she points to Umile's testimony

that he did not know why Suarez entered Caron, other than that it was "some type of

rehab program." (Umile Dep. 49:11–22, 51:3–5, 52:5–7.) She believes this is inconsistent with a February 16, 2017 email Umile sent to Angela Chertik, the Hospital's Leave of Absence Administrator, in which he stated Suarez "is being treated at an inpatient drug and alcohol facility." (Pl.'s Mem. Ex. Q.) Suarez also claims that Triantos's testimony that she did not know why Suarez sought treatment at Caron, other than that it was an inpatient rehabilitation program, (Triantos Dep. 40:8–19), is inconsistent with the fact that Triantos received Umile's email on December 19, as well as Triantos's own testimony that Suarez showed signs of substance abuse at work in November of 2016. *See* (Pl.'s Mem. Ex. L; Triantos Dep. 77:3–10). Finally, Suarez feels that Triantos's testimony that she was not involved in the approval or denial process for ADA leaves of absence, (Triantos Dep. 32:11–33:2), is inconsistent with Umile's testimony that when an employee asks for leave beyond "their 12 week [FMLA] allotment," Umile has a "dialogue back and forth" with nurse managers like Triantos who "determine[ ] whether or not based on operational needs [they] can afford to have someone continue to stay out." (Umile Dep. 46:11–8.)

Even accepting Suarez's interpretation of the record, the inconsistencies she alleges do not "go to the very core of [the Hospital's] proffered reason" for its actions, nor do they "'raise suspicions' about [a decisionmaker's] credibility." *See Lichtenstein*, 691 F.3d at 310 (quoting *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir.1997)) (finding evidence of pretext where the timing of the employer's decision to fire the plaintiff was "critical" to the issue of retaliation, the only evidence showing plaintiff was fired prior to taking FMLA leave was her supervisor's deposition testimony and the supervisor "repeatedly contradicted herself on the timing of her decision"). Nothing

about the timing of when Umile and Triantos learned Suarez was illegally using drugs, which is not protected by the ADA, and nothing about Triantos's involvement in any decisions with respect to Suarez's leave under ADA, which was approved, is material to Suarez's claims that she was discriminated against because of her depression and/or her status as a recovering drug addict and retaliated against for requesting FMLA leave. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647 (3d Cir. 2015) (affirming summary judgment for the employer where the employee did not "point to evidence that demonstrates [the employer] did not in fact rely on its articulated reasons when terminating her employment").

An appropriate order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.